IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

IN RE INTEREST OF LANDEN W. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF LANDEN W. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
NICHOLE B., APPELLANT.

Filed November 5, 2013.    No. A-12-1055.

Appeal from the Separate Juvenile Court of Douglas County: WADIE THOMAS, Judge.
Affirmed.

Matthew R. Kahler, of Finley & Kahler Law Firm, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, and Jennifer C. Clark for appellee.

MOORE, PIRTLE, and BISHOP, Judges.

PIRTLE, Judge.

INTRODUCTION

Nichole B. appeals from two orders of the juvenile court for Douglas County terminating her parental rights to her three children. Nichole challenges the statutory grounds for termination, as well as the juvenile court's finding that termination of her parental rights is in the children's best interests. Based on our de novo review of the record, we affirm the juvenile court's orders.

BACKGROUND

Nichole is the biological mother of Landen W., born in December 2005; Vincent W., born in August 2008; and Naomi W., born in December 2009.

In August 2007, the State filed a petition to adjudicate Landen and he was removed from Nichole's care. Landen was found to be a minor child within the meaning of Neb. Rev. Stat.

- 1 -

§ 43-247(3)(a) (Cum. Supp. 2006) in March 2008. In September, he was placed in the home of his biological father.

Vincent was removed from Nichole's care 2 days after he was born in August 2008 due to her volatile behavior during her stay at the hospital, and the State filed a supplemental petition to adjudicate him. In December, the juvenile court entered an order finding Vincent to be a minor child within the meaning of § 43-247(3)(a) (Reissue 2008).

Vincent was placed back in Nichole's care in March 2010. Around that same time, Landen's father was given custody of Landen and the juvenile court terminated jurisdiction as to Landen.

In July 2010, the State filed a second supplemental petition to adjudicate Landen, Vincent, and Naomi based on injuries Landen sustained while in Nichole's care. Vincent and Naomi were removed from Nichole's care and Landen was removed from his father's care, and all three children were placed in foster care. Nichole's boyfriend, Steven Manzer, was found to have caused Landen's injuries and was convicted of criminal charges. Nichole continued to have contact with Manzer until he was incarcerated, as she stated she did not know how Landen was injured.

In September 2011, the court entered an order adjudicating Naomi.

In April 2012, the State filed a second motion for termination of parental rights alleging that Nichole's rights to Vincent and Naomi should be terminated based on Neb. Rev. Stat. § 43-292(2), (6), and (7) (Cum. Supp. 2012) and that termination was in their best interests. On the same day, the State filed a fifth supplemental petition alleging that Landen came within the meaning of § 43-247(3)(a), that Nichole's parental rights to Landen should be terminated based on § 43-292(2), and that termination was in his best interests.

A joint trial was held on the second motion for termination in regard to Vincent and Naomi and the fifth supplemental petition in regard to Landen.

The State called multiple witnesses. Dr. Holly Filcheck, a clinical psychologist, testified that she had performed a psychological evaluation of Nichole, reaffirming a previous diagnosis of antisocial personality disorder and also diagnosing her with borderline personality disorder. According to Filcheck, both disorders are characterized by behavior in which the person afflicted seeks immediate gratification and is impulsive, places her needs above the needs of others, can be manipulative, and gets frustrated easily. Filcheck also diagnosed Nichole with bipolar disorder.

Further tests administered by Filcheck indicated that Nichole exhibited sadistic behavior, which is characterized as behavior that could potentially cause harm to the afflicted person in that the person makes poor choices and puts herself in risky situations. Filcheck testified that Nichole exhibited negativistic behavior, which is characterized as a negative outlook and can lead to depression. Nichole also exhibited paranoid behavior, which is characterized by the afflicted person's belief that others are out to get her or the actions of others negatively affect her and that they are doing it intentionally. Someone who exhibits paranoid behavior might also be suspicious of others and mistrusting. Nichole also exhibited delusional disorder, which is characterized by the afflicted person's experiencing feelings of grandeur (that everything revolves around her), making irrational decisions, and becoming jealous easily. Filcheck testified

that delusional disorder might affect one's parenting, because an afflicted person may place her own needs above those of her child and distract the parent from her child's concerns.

Nicole Conner, Nichole's therapist since January 2009, also testified. Conner testified that prior to January 2009, Nichole had been in therapy for 1½ to 2 years with another therapist. She testified that in therapy, Nichole had been working on emotional relation skills, improving coping skills, maintaining abstinence from illegal substances, and improving decisionmaking. Conner testified that initially she met weekly with Nichole, but for the last year, they had been meeting once per month. She testified that Nichole's attendance for sessions has always been consistent. Conner testified that therapy is still necessary for Nichole and may be something she needs throughout her lifetime to monitor her mental and emotional status, to check for a suicidal ideation or thoughts of harm to others, and to maintain safety for herself.

Conner testified that consistent psychiatric care and medication is important in conjunction with therapy for Nichole to be mentally healthy. Conner testified that Nichole had been seeing a psychiatrist and that Medicaid paid for Nichole's visits. Nichole told Conner that after the children were removed from her care, she no longer qualified for Medicaid. Without the aid, Nichole claimed that she could not afford the psychiatric treatment, and she stopped seeing her psychiatrist. Conner testified that she and Nichole's caseworkers told her to contact the Douglas County Mental Health Center about seeing a psychiatrist there. Conner testified that Nichole told her that she did not want to switch psychiatrists. Conner also testified that Nichole told her she had not made any effort to look into the Douglas County Mental Health Center for alternative psychiatric services.

Conner also testified that she and Nichole discussed the possibility of Nichole's switching to a psychiatrist who worked at Capstone, the same agency Conner worked for, and that Conner had talked to Nichole's family permanency specialist about getting the Department of Health and Human Services (the Department) to authorize payment. Conner did not recall Nichole's reporting any effort that she made on her own to obtain psychiatric care. Conner testified that to her knowledge, Nichole had not seen a psychiatrist for 7 months before trial.

Conner testified that in addition to not seeing a psychiatrist, Nichole also was not taking her medication because she claimed she could not afford it. Conner testified that she was concerned about Nichole's lack of medication, because medication is critical in Nichole's therapy. She testified that she has continuously talked to Nichole about the need for medication management and discussed options for obtaining her medication. Conner testified that Nichole had not taken any measures to secure her medication. Conner testified that the last time she spoke with Nichole about her medication, Nichole still had some medication and only took it when she was really upset.

Conner testified that in her last report, dated December 2011, Nichole's prognosis was "guarded," meaning Conner had concerns regarding Nichole's ability to successfully discharge from treatment and not need some type of mental health support from a professional in the future. She testified that Nichole's "guarded" prognosis was a result of her chronic mental health condition; her difficulty managing emotions, specifically her anger; and her up-and-down emotions, which are typical of patients with bipolar disorder. Conner testified that Nichole's prognosis at the time of trial remained "guarded."

Conner testified that Nichole's lack of consistent psychiatric care and medication would hinder her ability to implement the skills that are being taught to her.

Conner testified that during the few times she observed Nichole with her children, Conner had some concerns regarding Nichole's interaction with the children. Specifically, Nichole's tone of voice was not appropriate, "play fighting" would occur between Nichole and her boyfriend in front of the children, and she displayed other aggression. Despite these concerns, Conner testified that prior to July 2010 when Landen was injured, she was in support of the children remaining in Nichole's home.

Conner also testified that Nichole told her the children were removed in July 2010 because Landen injured his collarbone and she had to take him to the emergency room. Nichole told Conner that Landen was injured by falling from the monkey bars. However, Landen reported to hospital staff that Nichole's boyfriend had caused the injury.

Dr. Syed Prizada Sattar was Nichole's psychiatrist from 2007 to 2011. Nichole's last appointment with Sattar was in September 2011. Sattar testified that when he last saw Nichole, her diagnoses were bipolar disorder, alcohol dependence, methamphetamine dependence, and marijuana dependence (in remission). He testified that due to the severity of Nichole's symptoms, he recommended medication management. In 2011, he saw Nichole almost monthly so he could assess her response to medications and determine if a change of medication was necessary.

Sattar testified that the medications Nichole needed were generally only available by a prescription from a physician. He testified that after Nichole lost her Medicaid coverage, she informed him that she was having difficulty paying for her medication. Sattar testified that he tried to help her by giving her medication samples for free. He eventually suggested that she transfer to Lutheran Family Services for psychotherapy and medication management due to her inability to pay for his services and medication. However, Nichole did not provide Sattar with permission to release her medical information to Lutheran Family Services.

Sattar testified that there are options available for bipolar patients who do not have the monetary resources to pay to see a psychiatrist. He testified that Lutheran Family Services has a program where patients are charged for visits based on the individual's ability to pay. He further testified that Creighton University and the University of Nebraska both have programs offered by psychiatry residents and trainees for a reduced fee. Douglas County Hospital has a program for indigent patients as well. Sattar testified that all of these programs can also assist patients in regard to medication.

Sattar testified that bipolar disorder is a chronic medical condition requiring ongoing psychiatric care and medication in order to manage the disorder. He testified that an individual with bipolar disorder who does not continue medication management and ongoing psychiatric care may experience mood swings, irritability, impulsive decisionmaking, anger outbursts, and difficulty falling asleep and staying asleep, which can eventually lead to more medical and psychiatric complications. Sattar testified that failure to continue medication management and ongoing psychiatric care could also affect an individual's ability to parent a child, because it would lead to a lack of tolerance for the child's behaviors, impulsiveness, anger outbursts, depression, and lack of motivation and energy, all of which may lead to issues with neglect.

Elizabeth Klinetobe supervised Nichole's visits with her children between November 2011 and April 2012. She testified that when she began supervising visits, Nichole was having three visits per week for 3 hours at a time. The visits were to take place in a neutral location, and no unauthorized visitors were allowed. Klinetobe testified that during her first 2 months of supervising visits, Nichole repeatedly brought a friend to the visits despite her knowledge that the friend was not authorized to be present at visits. Klinetobe testified that each time she would tell Nichole the friend could not be present at the visit and that she would make the friend leave.

Klinetobe testified that early in 2012, visits began taking place in Nichole's home. There was no problem with unauthorized persons being present for visits.

Klinetobe testified that in March 2012, when Nichole found out that Landen would remain in the custody of his biological father, she called Klinetobe and yelled at her despite Klinetobe's lack of involvement in the decision. Nichole later called Klinetobe a second time and was crying uncontrollably and was hard to understand. Klinetobe testified that she was concerned about Nichole's mental health and told Nichole to contact her therapist to help calm her down.

Heidi DeGodt was the case manager for Nichole and her children from December 2008 until April 2010. DeGodt testified that she had consistent contact with Nichole during her time on the case. Nichole was employed, but working minimal hours; she was consistently attending therapy; participating in psychiatric appointments; consistently attending visitation; and participating in urinalysis testing.

DeGodt testified that when she was first assigned to the case in December 2008, Nichole's visits were semisupervised and taking place at a neutral location. In April 2009, the Department changed Nichole's visits to supervised visits because she had been displaying some emotional instability. Nichole was seen yelling and making threatening gestures at an individual at a park.

DeGodt testified that Nichole had also demonstrated emotional instability at the monthly family team meetings. She testified that at the meetings Nichole was quick to react, would yell at others present, would get tearful and emotional, and would say "bad things" about different individuals. As a result, most of the family team meetings were unproductive, because the time was spent trying to calm Nichole down rather than getting anything accomplished.

DeGodt testified that when Nichole was informed of the change in visitation, she became angry and yelled at DeGodt on the telephone. She testified that visits transitioned back to semisupervised and then to unsupervised and overnight visits. When DeGodt's involvement ended in April 2010, Vincent had been placed back into Nichole's home. Landen had been residing with his biological father during DeGodt's time on the case, and Naomi had not been removed.

Shannon Vanlaningham was the supervisor for several of Nichole's caseworkers between July 2008 and November 2010. Vanlaningham testified that there was a lot of conflict between Nichole and the case managers, and as a result, the case managers would sometimes ask her to attend meetings with Nichole to help mediate any conflicts that arose. Vanlaningham testified that at some of the meetings she attended, Nichole would be upset, have a negative attitude, and raise her voice. Nichole would also at times argue about anything that was asked of her or

recommended to her. Vanlaningham testified that when Nichole behaved this way, it was difficult to discuss the case plan or to have a productive meeting.

Vanlaningham testified that she observed the altercation which occurred in April 2009 that DeGodt referenced in her testimony. She saw the incident from a window in her office building. Vanlaningham testified that Nichole was standing on the side of the street flailing her arms and making threatening gestures toward another person. Vanlaningham could not hear what Nichole was saying, but she could tell that she was yelling. When the individual turned and walked away, Vanlaningham saw Nichole chase the individual halfway up the block and then stop and turn back the other direction. Vanlaningham reported the incident to DeGodt. Nichole told DeGodt that the altercation arose because the individual was making threatening statements about her children.

Vanlaningham testified that the children were removed from Nichole's care in July 2010 after Nichole had taken Landen to the emergency room, where it was found that he had bruises "all over his body," including his face, his back, and his groin area; had swelling in his scrotum; had petechiae (tiny spots that appear on the skin as a result of bleeding under the skin) on the side of his face; and had a broken collarbone.

Vanlaningham interviewed Landen after he sustained the injuries, and she observed many of his injuries. Vanlaningham also interviewed Nichole regarding Landen's injuries, and Nichole stated that Landen had slipped and fallen in the bathtub. Vanlaningham also reviewed the hospital reports in regard to Landen's injuries. Based on the interviews she conducted and the hospital reports, Vanlaningham felt that it was appropriate to keep Landen, Vincent, and Naomi out of Nichole's home.

Clarissa Nielsen, a family permanency specialist employed with Nebraska Families Collaborative (NFC), testified that she was assigned to Nichole's case in January 2012 and was still assigned at the time of trial. Nielsen testified that when she became involved in the case, NFC was paying for Nichole's individual therapy with Conner and it was willing to pay for psychiatric care. She testified that she worked with Conner to set up a psychiatrist for Nichole through Capstone, the same agency Conner worked for. She testified that there had been a glitch in getting Nichole's psychiatric care authorized, but that the problem was resolved in June 2012. Nichole was told that she could receive psychiatric treatment at Capstone and that NFC would pay for it. Nielsen testified that at the time of trial, Nichole had not gone to Capstone to receive psychiatric treatment. Nielsen testified that she does not believe that Nichole has seen a psychiatrist or has taken any type of psychiatric medication since Nielsen became the caseworker in January 2012.

In regard to medication, Nichole stated at a family team meeting that she had medication to take, which she had with her and displayed. Nielsen testified that it did not appear that the medication had ever been taken. Nielsen testified that Nichole never asked her about getting financial assistance to pay for medication, and no one involved with Nichole's case ever told Nielsen that Nichole had been trying to obtain medication but could not afford it.

Nielsen testified that NFC requires clients such as Nichole to fill out a monthly budget to show where their money is being spent, but Nichole has never completed a budget. Despite her failure to provide a budget, NFC was still paying for her individual therapy and was willing to pay for psychiatric care. Nielsen also requested paystubs from Nichole on a monthly basis to

show proof of employment. Nielsen testified that Nichole has claimed to be employed throughout Nielsen's involvement with the case, but Nichole has provided only one paystub.

Nielsen testified that the last contact she had with Nichole was on June 28, 2012. Since that date, Nielsen has tried to contact Nichole through telephone calls, through text messages, and by sending letters. Nielsen also made two unannounced visits to Nichole's residence to try to get in contact with her, but she either was not home or did not answer the door. Nielsen has not been able to locate Nichole at her place of employment, because although Nielsen knows the name of the business that Nichole said she worked for, she does not know at which location Nichole was employed.

Nielsen testified that Nichole has not attended any family team meetings since Nielsen's last contact with her. Prior to June 2012, Nichole had attended family team meetings every month. She testified that several of the family team meetings were not productive due to Nichole's behaviors, which included her yelling; being uncooperative; refusing to calm down; not listening to the service providers or her attorney; being rude; saying inappropriate things, such as calling one service provider a "bitch" and other such insulting names; and exhibiting other inappropriate behavior.

When Nielsen began working with Nichole's family in January 2012, the visits were supervised and that had not changed at the time of trial. The visits were three times a week, for 4 hours a visit, but in July, the frequency of visits changed to one visit per week for 4 hours. The frequency of Nichole's visits had been reduced because she had missed a total of 20 visits between May and July, attending less than half of her scheduled visits. The frequency was reduced under the agreement that if in 30 days Nichole had attended all meetings without any unexcused absences or cancellations, the frequency of visits would be revised. After the visits were reduced to once a week, Nichole's attendance became more consistent.

Nielsen also testified that when Landen's father was awarded custody of Landen, Nichole told Nielsen that her life was over, she said she did not want to live anymore, and she gave the visitation worker all of her razors and knives so that Nichole would not hurt herself.

Nielsen testified that she does not believe Nichole has made progress overall during the 9 months she has been assigned to the case. She testified that she had made progress in a few areas, such as in the area of employment and being able to sustain herself financially, although she has not provided any documentation of employment. She testified that Nichole had been working with the family support worker, but was not making progress on the goals set for her. She was attending some visitation and had maintained a home.

Nielsen testified that she supports the termination of Nichole's parental rights regarding all three children based on the lack of progress Nichole has made since 2007, when the Department first became involved. She testified that she is concerned with the type of people Nichole involves her children with and that she is concerned about Nichole's mental capacity and her ability to identify safety concerns, because the children are young and cannot protect themselves. Nielsen testified that her concern about Nichole's ability to identify safety concerns stems from a time Nielsen stopped by Nichole's home in April 2012 and Nielsen observed a container of gasoline on Nichole's kitchen floor and a lighter on the counter. When Nielsen told Nichole that was not safe for the children, Nichole's reply was simply that the children do not go into the kitchen. Nielsen testified that there was nothing preventing the children from going into

the kitchen. Nielsen also observed other safety concerns in Nichole's home, including general uncleanliness, disorganization, and spoiled food, which Nielsen observed upon every visit; this concerned her due to the fact that Nichole had received almost 5 years of services.

Nielsen testified that she did not believe that Nichole could provide permanency for her children, that she could provide for the needs of her children, that she could provide a stable and safe home environment, or that she could provide for their future.

Kerri Armstrong was assigned to Nichole's case from April to December 2010 as a child and family services specialist. She acquired the case from DeGodt. She testified that at the time she took over the case, Landen's father had just been given custody of Landen so he was no longer part of the case. About that same time, Vincent was returned to Nichole's care. The Department continued to provide Nichole with psychological services, medication management, a family support worker, and individual therapy. Armstrong testified that prior to Landen's injuries in July 2010, she was considering closing Nichole's case.

Armstrong testified about the events of July 2010. She testified that the Department was notified that Nichole had taken Landen to the hospital with injuries, including multiple areas of bruising and a broken collarbone. Armstrong testified that she spoke with Nichole about the injuries and Nichole first said that the injuries were caused by a fall from the monkey bars at the babysitter's house. Armstrong testified that Nichole later said that some of the injuries were caused by a fall in the bathtub. Armstrong testified that Landen stated that Manzer caused his injuries. After Landen's injuries became known to the Department, all three children were put in foster care. Landen was returned back to his father's home within the month. Armstrong testified that a warrant was issued for Manzer's arrest in connection with Landen's injuries.

Rachelle Barcel is employed by NFC and was the family permanency specialist for Nichole's family from June 2010 to February 2012. Barcel also testified that before Landen was injured, she was looking at closing the case when she took it over.

Barcel testified that when she first was assigned to Nichole's case, Nichole's individual therapy with Conner and her psychiatric visits with Sattar were being paid through Medicaid. She testified that if Nichole could not pay for psychiatric services or individual therapy, NFC would assist her, but would require her to submit a budget. Barcel testified that in early 2011, Nichole asked if NFC could help pay for individual therapy and psychiatric services. Barcel testified that NFC agreed to help her, but she had to pay a portion of the fees for psychiatric services. Barcel testified there was no lapse between the time Nichole stopped receiving Medicaid and when she began receiving money from NFC.

In approximately October 2011, NFC stopped providing partial payment for Nichole's visits with Sattar because NFC wanted Nichole to be able to provide payment on her own. She was given names of providers that would allow her to pay based on her income level.

Barcel testified that at some family team meetings, Nichole was argumentative and would use inappropriate language, including calling Barcel a "bitch" and other similar insulting words. Nichole would get upset, and she or her attorney would end the meeting. As a result, the meetings were not productive. Barcel testified that she and other case professionals considered Nichole difficult to work with and that this hindered their ability to provide services to her. Barcel also testified that Nichole stated she did not want the family support work that was offered to her, because she felt she had already met her goals and did not need the extra help.

Barcel testified about her concerns in regard to Nichole's visitation with the children. Barcel testified that Nichole would miss about 4 or 5 visits out of 12 per month. Barcel testified that on more than one occasion, when Nichole had visits with the children outside or in public places, nonapproved individuals would show up at the visits. When this happened, Nichole did not tell them to leave and the visitation worker would have to intervene and ask the individuals to leave.

Barcel also testified that Manzer was approved to be present at visits prior to the July 2010 incident. After the incident occurred, he was present at a family team meeting in August 2010. Barcel also testified that someone reported that Manzer was present during visits at some point after the July 2010 incident, but she was unable to prove that this was true. Barcel testified that she told Nichole she should stay away from Manzer based on the allegations that he had caused Landen's injuries. Nichole told Barcel that she could be with whomever she wants to be with and that Manzer had been approved to attend visits, so he was safe for the children to be around. Nichole denied that Manzer was still living with her. Barcel testified that Nichole stated that she did not believe Manzer caused Landen's injuries. Nichole did not obtain a protection order against Manzer until October 2011, 16 months after Landen was injured.

At the time of trial, Barcel had worked with Nichole for 20 months and believed, based on her education, training, and knowledge, that Nichole's rights to her three children should be terminated and that termination was in the children's best interests. Barcel testified that her opinion was based on the length of time the Department has been involved with Nichole and the children and that Nichole left the children in the care of inappropriate people. Barcel also testified that Nichole's protective capacities had not increased and that she does not understand why the children were removed in July 2010 and does not take responsibility for her role in the problems that her children have encountered. She also testified that in her experience, it is difficult for a noncooperative parent to reunify.

Nichole testified in her own behalf. She testified that she was living with Manzer at the time of Landen's injuries. She testified that Manzer had been approved to be present at visits and at family team meetings and that therefore, he was safe for the children to be around. She testified that she did not know if Manzer caused Landen's injuries because she was not there at the time the injuries occurred. She testified that she was aware that Manzer was arrested, prosecuted, and incarcerated for causing Landen's injuries. She testified that she has not had any contact with Manzer since he was arrested.

Nichole also admits that Manzer was not the first inappropriate person that she brought around her children. She stated that Landen's removal in 2007 was a result of her leaving him with an inappropriate caregiver, whom she later learned was a sex offender.

Nichole admitted that her therapist told her of places she could go to receive psychiatric services and be charged based on her income, but that she did not go. She also testified that she believed the State should continuously pay for her visitation services and mental health services because she lost her Medicaid benefits and was not approved for disability.

On October 12, 2012, the juvenile court entered an order finding that Vincent and Naomi were within the meaning of § 43-292(2), (6), and (7) and that it was in their best interests to terminate Nichole's parental rights. On that same day, the juvenile court entered a separate order

finding that Landen was within the meaning of §§ 43-247(3)(a) and 43-292(2) and that it was in his best interests to terminate Nichole's rights.

## ASSIGNMENTS OF ERROR

Nichole assigns that the juvenile court erred in (1) finding that the children come within the meaning of §§ 43-247(3)(a) and 43-292 and (2) finding that it was in the children's best interests to terminate her parental rights.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Candice H.*, 284 Neb. 935, 824 N.W.2d 34 (2012).

## ANALYSIS

*Statutory Grounds.*

The juvenile court found that the State proved grounds for termination of Nichole's parental rights to all three children under § 43-292(2) and also proved grounds for termination of Vincent and Naomi under § 43-292(6) and (7). In order to terminate an individual's parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012). Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved. *In re Interest of Leland B.*, 19 Neb. App. 17, 797 N.W.2d 282 (2011).

Under § 43-292(7), the State must show that the child has been in an out-of-home placement for 15 or more months of the most recent 22 months. The evidence was unchallenged that Vincent and Naomi were removed from Nichole's home on July 6, 2010, and have not returned to her home since then, for a total of 22 months in out-of-home placement of the past 22 months at the time of the termination hearing. Accordingly, the State proved § 43-292(7) by clear and convincing evidence with respect to Vincent and Naomi.

Because the State need prove only one ground for termination, we decline to consider Nichole's arguments regarding the court's determination that the State proved other grounds enumerated in § 43-292 with respect to Vincent and Naomi. Generally, when termination is sought under subsections of § 43-292 other than subsection (7), the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). Thus, we will consider evidence relevant to the other grounds in our analysis of Vincent's and Naomi's best interests.

The State did not allege § 43-292(7) as a statutory ground for termination in regard to Landen. It alleged only § 43-292(2), so we must consider whether the State proved this statutory ground in connection with Landen.

Under § 43-292(2), grounds for termination exist when the parent has "substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile

necessary parental care and protection." The record shows that the Department has been involved with Nichole since 2007, when Landen was removed from her care because she had left him with an inappropriate caregiver. He was 20 months old at that time. In September 2008, Landen was placed with his father, and in March 2010, his father was given custody of Landen.

In July 2010, Landen sustained significant injuries that were caused by Nichole's boyfriend. After the injuries occurred, Nichole told the Department workers that the injuries were caused by a fall from the monkey bars and/or from a fall in the bathtub. Landen, however, told the authorities that Manzer caused the injuries, and Manzer was convicted on criminal charges for causing Landen's injuries. Rather than believing her son and recognizing Manzer's conviction, Nichole testified that she did not know if Manzer caused Landen's injuries because she was not there at the time the injuries occurred. She testified that she has not had any contact with Manzer since he was arrested, but there was evidence that she did have contact with him after the injuries occurred and he was accused of causing the injuries. She was advised by Barcel to stay away from Manzer, to which advice Nichole responded that she could be with whomever she wants to be with. She did not file a protection order against Manzer until 16 months after the injuries to Landen occurred. Nichole's refusal to admit that Manzer caused Landen's injuries, despite all the evidence, demonstrates her failure to care for and provide protection for Landen.

Nichole also admitted that Manzer was not the first inappropriate person that she had left Landen with. She acknowledged that Landen's removal in 2007 was a result of her leaving him with an inappropriate caregiver, who she later learned was a sex offender.

Nichole's failure to get psychiatric treatment and take her medication on a regular basis is also relevant to the allegation of neglect pursuant to § 43-292(2) in regard to Landen. Nichole suffers from antisocial personality disorder, borderline personality disorder, and bipolar disorder. Bipolar disorder is an ongoing medical condition requiring ongoing psychiatric care and medication in order to manage the disorder. Sattar testified that an individual with bipolar disorder who does not continue medication management and ongoing psychiatric care may experience mood swings, irritability, impulsive decisionmaking, anger outbursts, and difficulty falling asleep and staying asleep, which can eventually lead to more medical and psychiatric complications. Sattar testified that failure to continue medication management and ongoing psychiatric care could also affect an individual's ability to parent a child, because it would lead to a lack of tolerance for the child's behaviors, impulsiveness, anger outbursts, depression, and lack of motivation and energy, all of which may lead to issues with neglect.

At the time of trial, Nichole had not seen a psychiatrist since her last visit with Sattar in September 2011. There was also evidence that she was not taking her medication on a regular basis, but, rather, only when she believed she needed it. Nichole's failure to manage her bipolar disorder on a continuous basis supports a finding of neglect in regard to Landen, because if she is not taking care of her own mental health, she cannot take care of Landen's needs.

We conclude that the juvenile court did not err in finding that the State proved § 43-292(2) by clear and convincing evidence in regard to Landen.

*Best Interests.*

Nichole also assigns that the juvenile court erred in finding that terminating her parental rights was in the children's best interests. We conclude that the juvenile court did not err in its finding.

The Department has been involved with Nichole in regard to the care of one or more of her children since August 2007. She has been offered various services over the years, including services related to her mental health. Nichole's bipolar disorder is an ongoing condition requiring ongoing psychiatric care and medication in order to manage the disorder. Nichole has not seen a psychiatrist since September 2011 and is not taking her medication on a regular basis. Nichole argues that the Department did not provide her with adequate services to meet her mental health needs. She also contends that she did not have the financial means to pay for psychiatric care and medication. However, the evidence shows that she was made aware of various options for obtaining psychiatric care and medication based on her income.

Following Landen's injuries in July 2010, Nichole continued to have contact with Manzer before he was arrested, despite the allegations that he had caused Landen's injuries. Even after Manzer was convicted of criminal charges in regard to Landen's injuries, Nichole was still unwilling to admit that Manzer caused the injuries. She testified that she did not know who caused the injuries, because she was not present when they occurred. Her denial in regard to Landen's injuries shows her inability or unwillingness to protect her children and to put their needs before her own.

Although prior to Landen's injuries the Department was considering closing Nichole's case, Nichole's behavior and actions since that time fail to show that she should be reunited with her children. She has been difficult and uncooperative at many family team meetings, making it difficult to have a productive meeting and to discuss the case plan. She has had unauthorized friends or other individuals present at visits, despite being told on numerous occasions that only authorized individuals were allowed at visits. In addition, Nielsen, Nichole's family permanency specialist at the time of trial, testified that she had no contact with Nichole since June 2012, which was 2 months before trial, despite her numerous attempts to contact her. Nielsen testified that she does not believe Nichole has made overall progress during the 9 months she had been on the case.

Nielsen testified that she supports the termination of Nichole's parental rights regarding all three children based on the lack of progress Nichole has made since 2007. She testified that she is concerned about the type of people that Nichole involves her children with, Nichole's mental capacity, and her ability to identify safety concerns, because the children are young and cannot protect themselves. She further testified that she did not believe that Nichole could provide permanency for her children; that she could provide for the needs of her children; that she could provide a stable, safe home environment; or that she could provide for their future.

Barcel, who worked with Nichole for 20 months, testified that based on her education, training, and knowledge, that termination is in the children's best interests. She testified that her opinion was based on the length of time the Department has been involved with Nichole and the children and Nichole's leaving the children in the care of inappropriate people. Barcel also testified that Nichole's protective capacities have not increased and that Nichole does not

understand why the children were removed in July 2010 and does not take responsibility for her role in the problems that her children have encountered.

Landen was initially removed from Nichole's home in 2007. Vincent and Naomi have been removed from Nichole's care since July 2010. Vincent was also removed from Nichole's care at birth and eventually placed back in Nichole's care. All three children deserve stability and permanency, which does not appear to be possible with Nichole. When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the child's best interests require termination of parental rights. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Id.* Therefore, we conclude the State provided clear and convincing evidence that terminating Nichole's parental rights was in the children's best interests.

## CONCLUSION

Based on our de novo review of the record, we conclude that the juvenile court did not err in terminating Nichole's parental rights to her minor children. The order of the juvenile court terminating Nichole's parental rights to Vincent and Naomi, and the order of the juvenile court terminating Nichole's parental rights to Landen are affirmed.

AFFIRMED.